ANTHONY M. BARNES (Bar No. 199048)
Email: amb@atalawgroup.com
JASON R. FLANDERS (Bar No. 238007)
Email: jrf@atalawgroup.com
KENYA S. ROTHSTEIN (Bar No. 340854)
Email: ksr@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Phone: (917) 371-8293

*Attorneys for Plaintiff*
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC PALLET EXCHANGE, INC., a California corporation,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)** |

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges the following upon information and belief:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). (*See* 33 U.S.C. § 1365.) This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    Pursuant to 40 C.F.R. § 135.2(a)(2), on May 11, 2023, CSPA issued a 60-day notice letter ("Notice Letter"), to Pacific Pallet Exchange, Inc. ("Pacific Pallet" or "Defendant"), as the owners and operators of the facility. The Notice Letter was also sent to Pacific Pallet's Chief Executive Officer and Agent for Service of Process. The Notice Letter informed Defendant of their ongoing violations of substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 et seq. and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Loads ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order 2018-0028-DWQ (effective July 1, 2020) (hereafter the "Storm Water Permit" or "General Permit") and the Clean Water Act at the industrial facility located at 3315 51st Avenue, Sacramento, CA 95823 with Waste Discharger Identification Numbers ("WDID") 5S34I0279201 and 5S34NEC011786 ("Facility").[1]

---

[1] 5S34I027920 is the only WDID referenced in the most recent Facility Stormwater Pollution Prevention Plan ("SWPPP") dated May 31, 2022. Another Construction Site Program SWPPP regarding Pacific Pallet was recently submitted to Regional Water Quality Control Board, Central Valley Region, but is applicable to industrial storm water discharges.

3.     The Notice Letter was also sent to the U.S. Attorney General Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

4.     The Notice Letter informed Defendant of CSPA's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

## II.    INTRODUCTION

5.     With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1   6.   Heavy metals, including copper, zinc, and lead that accumulate in lakes,
2  oceans, rivers and streams threaten the environment and can instigate health problems
3  and genetic changes in aquatic life, birds and other animals dependent on these
4  waterbodies. These metals in water cannot be easily metabolized by aquatic organisms
5  and can become enriched in organs such as the liver and kidney. Studies show that
6  heavy metals can enter aquatic animals through their gills or during feeding and bind
7  with substances in the bodies of wildlife. High concentrations of total suspended solids
8  ("TSS") degrade optical water quality by reducing water clarity and decreasing light
9  available to support photosynthesis. TSS has been shown to alter predator-prey
10 relationships (for example, turbid water may make it difficult for fish to hunt prey).
11 Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also
12 be harmful to aquatic life because numerous pollutants, including metals and
13 polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations
14 of TSS result in higher concentrations of toxins associated with those sediments.
15 Inorganic sediments, including settleable matter and suspended solids, have been
16 shown to negatively impact species richness, diversity, and total biomass of filter
17 feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH
18 can damage the gills and skin of aquatic organisms and cause death at levels above 10
19 standard units. The pH scale is logarithmic, and the solubility of a substance varies as
20 a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold
21 increase or decrease in ion concentration. If the pH of water is too high or too low, the
22 aquatic organisms living within it will become stressed or die.

23   7.   This complaint seeks a declaratory judgment, injunctive relief, the
24 imposition of civil penalties, and the award of costs, including attorney and expert
25 witness fees, for Defendant's substantive and procedural violations of the Storm Water
26 Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[2]

27
28

[2] The Facility is fully described in Section V below.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

8.     CSPA specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.   PARTIES

### A. California Sportfishing Protection Alliance

9.     CSPA is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. CSPA's primary address and office is located at 1608 Francisco St., Berkeley, California 94703.

10.    CSPA's members live and/or recreate in and around the Sacramento River. CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, CSPA actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

11.    CSPA members work, own homes and live in Sacramento County and use and enjoy the waters near the Facility, including Morrison Creek and the Sacramento River (the "Receiving Waters" herein), nearby waterfronts, bordering parks, pathways, and athletic fields, for fishing, biking, sailing, boating, kayaking, viewing wildlife, walking, running, and engaging in scientific study, including habitat monitoring and restoration activities.

12.    Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in Sacramento River and impair CSPA's and its members' use and enjoyment of those waters.

13.    The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests of CSPA's members have

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

14.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

15.    The interests of CSPA and CSPA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

**B. The Owners and/or Operators of the Facility**

16.    CSPA is informed and believes, and thereon alleges, that Pacific Pallet Exchange, Inc., maintains its principal place of business at 3315 51st Avenue, Sacramento, CA 95823.

17.    CSPA is informed and believes, and thereon alleges, that Pacific Pallet is owner and operator of the Facility.

18.    CSPA is informed and believes, and thereon alleges, that Pacific Pallet is an active California corporation registered in California.

19.    CSPA is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Pacific Pallet is Timothy E. Tucker, who is located at 3117 Dwight Road, Suite 400, Elk Grove, CA 95758.

20.    CSPA refers to Defendant Pacific Pallet and its management herein as the "Owners/Operators" of the Facility.

**IV.    STATUTORY BACKGROUND**

**A. The Clean Water Act**

21.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

22.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p).) States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342.)

23.     Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. (*See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).)

24.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. (33 U.S.C. §§ 1311(a), 1342.; *see* 40 C.F.R. § 122.26(c)(1).)

25.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." (33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.)

26.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." (33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.)

27.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

vessel or other floating craft, from which pollutants are or may be discharged." (33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.)

28.    "Navigable waters" means "the waters of the United States." (33 U.S.C. 1362(7); 33 CFR § 328.3.)

29.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." (*See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).)

30.    The Defendant a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

31.    An action for injunctive relief is authorized under Section 505(a) of the CWA, (33 U.S.C. § 1365(a).)

32.    Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after May 11, 2018, commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects Pacific Pallet to a penalty of up to $59,937 per day per violation.

33.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B. California's Storm Water Permit**

34.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. (*See* 33 U.S.C. § 1342(b).)

35.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, (2006) 135 Cal. App. 4th 1377, 1380-81.) In California, the State Board is charged with regulating pollutants to protect California's water resources. (*See* Cal. Water Code § 13001.) The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. (Storm Water Permit, Section XXI(A).)

36.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. (*See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).)

37.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

38.     On July 1, 2015, the current Storm Water Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ*. (Storm Water Permit, Section I(A) (Finding 4).)

39.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1   Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide
2   Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use
3   ("2018 Permit Amendment").

4     40. In order to discharge storm water lawfully in California, industrial
5   dischargers must secure coverage under the Storm Water Permit and comply with its
6   terms or obtain and comply with an individual NPDES permit. (Storm Water Permit,
7   Section I.A (Findings 8, 12).) Prior to beginning industrial operations, dischargers are
8   required to apply for coverage under the Storm Water Permit by submitting a Notice
9   of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm
10  Water Associated with Industrial Activity ("NOI") to the State Board. (Storm Water
11  Permit, Section I.A (Finding 17), Section II.B.)

12  **C. The Storm Water Permit's Discharge Prohibitions, Effluent Limitations,**
13  **and Receiving Water Limitations**

14    41. The Storm Water Permit contains certain absolute prohibitions. The
15  Storm Water Permit prohibits the direct or indirect discharge of materials other than
16  storm water ("non-storm water discharges"), which are not otherwise authorized by an
17  NPDES permit, to the waters of the United States. (Storm Water Permit, Discharge
18  Prohibition III(B).)

19    42. Effluent Limitations Section V(A) of the Storm Water Permit requires
20  dischargers to reduce or prevent pollutants associated with industrial activity in storm
21  water discharges through the implementation of Best Available Technology
22  Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best
23  Conventional Pollutant Control Technology ("BCT") for conventional pollutants.
24  Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc,
25  among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include
26  biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

27    43. Discharge Prohibition III(C) of the Storm Water Permit prohibits storm
28  water discharges that cause or threaten to cause pollution, contamination, or nuisance.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

44.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). (Storm Water Permit, Section V(A).) EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. (*See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).)

45.     The 2015 Multi-Sector General Permit (MSGP) parameter Benchmarks, among others, are as follows: TSS—100 mg/L; aluminum—.075 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; lead—0.082 mg/L; cyanide—0.022 mg/L; copper—0.014 mg/L; zinc—0.12 mg/L; iron—1.0 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L.

46.     The EPA's most recent, 2021 Parameter Benchmark Values for the following parameters, among others, are as follows: TSS—100 mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; lead—0.082 mg/L; copper—0.00519 mg/L; zinc—0.12 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

47.     The Storm Water Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. (See Storm Water Permit, Section I(M)(Finding 62).) Annual NALs, not accounting for water hardness, for the following parameters are: pH—6.0 – 9.0 standard units; TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L; lead—.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; N+N—0.68 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. Storm Water

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS— 400mg/L; O&G—25mg/L. (Id.) NALs for heavy metals are also dependent upon water hardness.

48.     An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year[3] exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. (Stormwater Permit Section XII.A.)

49.     Receiving Water Limitation VI(B) of the Storm Water Permit prohibit storm water discharges from adversely impacting human health or the environment.

50.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. Storm Water Permit, Section VI(B).

51.     Receiving Water Limitation VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

52.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

53.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

54.     The State Water Quality Control Board, Central Valley Region, has issued the Water Quality Control Plan for the Central Valley Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source

---

[3] A reporting year under the General Permit is July 1 to June 30.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as arsenic, cadmium and iron. (Basin Plan, Table 3-1.) The Basin Plan states that the waters shall not contain chemicals in concentrations that adversely affect beneficial uses. (*Id*. at 3-3.) The Basin Plan also provides that "All waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." (*Id*. at 3-8.)

55.    The Basin Plan specifies beneficial uses for Sacramento River and its tributaries such as municipal and domestic supply, agricultural supply, migration, spawning, contact and non-contact water recreation, wildlife habitat, cold and warm freshwater habitat, and navigation. (Basin Plan, Table 2-1. (Basin Plan, Table 2-1.)

56.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

57.    The Receiving Waters herein are impaired for several constituents, including Mercury, DDT (Dichlorodiphenyltrichloroethane), dieldrin, pentachlorophenol (PCP), diazinon, pyrethroids, and toxicity.

58.    In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. (40 C.F.R. § 131.38.) The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as, 0.065 mg/L for lead, 0.013 mg/L for copper, 0.022 mg/L for cyanide, 0.0043 mg/L for cadmium, and 0.12 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[4]

---

[4] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. (*See* Storm Water Permit, Attachment H at ¶ 18.)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

59.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. (*See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.)

60.     Discharges with pollutant levels in excess of the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations. (*See* Storm Water Permit, Section VI(A).)

**D. The Storm Water Permit's Numeric Effluent Limitations**

61.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

62.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be

implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

63.   The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

64.   The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

65.   The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Storm Water Permit, Section X(B)(2).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. Id. at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II (I)(1).

**E. The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

66.    The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)-(D). The MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. Id.

67.    Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

68.    The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Id.

69.    The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55-56) and XI.

70.    Section XI(A)(4) of the Storm Water Permit require that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

71.    Section XI(A) of the Storm Water Permit require dischargers to conduct monthly visual observations of storm water discharges.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

72.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. See Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

73.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

74.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

75.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

76.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for total suspended solids, oil and grease, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

77.     All facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification Codes ("SIC") 2448, covering establishments primarily engaged in manufacturing wood pallets and skids. Under SIC Code 2448, Pacific Pallet is required to sample storm water for TSS, O&G, pH, and chemical oxygen demand ("COD").  As required by the General Permit and the Regional Board, facilities must also sample for additional parameters identified on a facility-specific basis to reflect pollutant source assessments, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI.B.6. Pacific Pallet also samples for the industry-related parameter biochemical oxygen demand ("BOD"). Defendant self-reports storm water sample for the pollutants listed above pursuant to a pollutant source assessment.

78.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

**F. Exceedance Response Action Requirements**

79.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. See Storm Water Permit, Section XII(C).

80.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. See Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater

Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. See Storm Water Permit Section XII(C)(1)(a)-(c).

81.   Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. See Storm Water Permit, Section XII(C)(1)(c).

82.   Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. See Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

83.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. See Storm Water Permit, Section XII(C)(2)(a)(iii).

84.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled after BMP implementation indicate no additional NAL exceedances for that parameter. See Storm Water Permit, Section XII(C)(2)(b).

85.   A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the

reporting year during which the NAL exceedance(s) occurred. See Storm Water Permit, Section XII(D).

86.     A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. See, Storm Water Permit, Section XII(D).

## V.     STATEMENT OF FACTS

### A. Pacific Pallet Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility

87.     Defendant operates an industrial facility located at 3315 51st Avenue, Sacramento, CA 90755, in close proximity to Morrison Creek which flows to the Sacramento River.

88.     The Facility's primary industrial purpose is the supply and production of new and recycled crates, skids, and pallets. CSPA is informed and believes, and thereon alleges that industrial activities at the Facility are conducted outdoors and exposed directly or indirectly to storm water. These activities include the re-manufacturing of new lumber, saw cutting, nailing, painting, pallet storage, use of automated pallet manufacturing systems, other product storage, and product delivery in Pacific Pallet owned transport vehicles. Other activities at the Facility include shipping and receiving, truck storage, and vehicle traffic.

89.     Industrial activities occur throughout the Facility that includes areas for lumber storage, loading and receiving, machining, cutting, shop, manufacturing and fabrication areas, fuel storage area, painting area, equipment and site maintenance areas, waste storage areas, dustbag areas and other areas of industrial activity.

90.     Pollutants of concern from industrial areas and industrial activities at the Facility include, but are not limited to, O&G, pH, TSS, BOD, and COD, lubricants,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

and debris and dirt. Industrial activities at the Facility generate and release pollutants which are discharged in storm water from the Facility into Morrison Creek which flows to the Sacramento River, both waters of the United States within the meaning of the Act.

91.    The Facility SWPPP describes two (2) drainage areas ("DA") with industrial storm water only sampled at DA-1. DA-1 includes storm water runoff from certain lumber storage areas, other areas of industrial storage and industrial activities, and a boneyard and discharges to a grate drain inlet and enters the City of Sacramento municipal separate storm sewer system ("MS4") which is said to flow to the Sacramento River. DA-2 includes the remainder of the Facility. Storm water from DA-2 through the painting and manufacturing areas and other lumber and industrial storage areas and out the gate at 51st Avenue and discharges into an MS4 inlet on 51st Avenue which empties into the Sacramento River. Storm water drainage at the site flows into the City of Sacramento MS4, which discharges into the Sacramento River. During large storm events the Facility also discharges industrial can indirectly discharge to Morrison Creek.

**B. Sacramento River**

92.    CSPA and its members utilize the Sacramento River for research, study, and recreation. CSPA monitors the water quality, insect populations, and habitat at multiple locations along the Sacramento River. The Sacramento River provides habitat for an abundant variety of aquatic and bird species and other wildlife and is critical habitat for species, including many that are endangered, threatened, rare, and endemic to Northern California.

93.    Ample recreational opportunities exist in and around the Sacramento River, including water contact sports such as bird watching, kayaking, fishing, wildlife viewing, swimming, sailing, walking, bicycling, and boating.

///

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

**C. The Facility Storm Water Permit Coverage**

94.     SMARTS lists two Facility WDID numbers for industrial activity for the Facility as noted above. One of those included submission for approval of a No Exposure Certificate and is listed on SMARTS for Facility coverage under the Storm Water Permit as "Active." Publicly available materials obtained by CSPA evidence a Facility that is not eligible for a No Exposure Certificate with industrial activities occurring outdoors and exposed to storm water.

95.     Via search of the SMARTS database, CSPA obtained the Facility SWPPP and NOIs for both WDIDs.  The NOIs and the Facility SWPPP states that the Receiving Water is also Sacramento River.

96.     CSPA is informed and believes, and thereon alleges, that Pacific Pallet has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements since at least May 11, 2018. Pacific Pallet has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

97.     CSPA is informed and believes, and thereon alleges, that the Facility Owners/Operators failed to implement any additional BMPs as required by the General Permit. As such, the Owners and/or Operators are in daily violation of this requirement of the General Permit.

98.     CSPA is informed and believes, and thereon alleges, that Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

99.     CSPA is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: TSS, O&G, pH, COD, and BOD.

100.   CSPA is informed and believes, and thereon alleges, that Pacific Pallet has failed to implement the minimum BMPs required by the General Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak

prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. General Permit, Sections X.H.1(a–g). The BMPs that are described in the Facility's SWPPP are insufficient to prevent the NAL exceedances for constituents listed above. As evidenced by the sample results, the current BMPs at the Facility are inefficient, and the Facility's Monitoring Implementation Plan needs improvement.

101.   CSPA is informed and believes, and thereon alleges, that Pacific Pallet has further failed to implement sufficient advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. General Permit, Sections X.H.2. The Facility SWPPP references storm water treatment systems and other BMPs that have proven insufficient and ineffective in achieving compliance with the Storm Water Permit.

102.   CSPA is informed and believes, and thereon alleges, that there are also insufficient minimal BMPs implemented, such as good housekeeping.

103.   CSPA is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least May 11, 2018.

104.   CSPA is informed and believes, and thereon alleges, that storm water containing excess O&G, TSS, COD, and BOD occur each time storm water or non-storm water discharges from Facility in violation of the Storm Water Permit Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

105.   CSPA is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

106. CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

107. CSPA is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

108. CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

109. CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

**D. Storm Water Discharges from the Facility**

110. As detailed in the Facility SWPPP, there are two (2) discharge points at the Facility and where storm water flows to the city of Sacramento's MS4 and into Morrison Creek and then to the Sacramento River. The Sacramento River flows into the Sacramento-San Joaquin River Delta, a crucial California Resource.

111. CSPA is informed and believes, and thereon alleges, that Pacific Pallet has self-reported NAL exceedances from the Facility over the past five (5) reporting

years and should enter or remain in the State Board's ERA Program for NAL exceedances of TSS, COD, and BOD following storm water sampling results from the 2022-2023 reporting year.

**E. The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

112.   CSPA is informed and believes, and thereon alleges, that pollutants from the Facility discharge TSS, pH, O&G, COD and BOD with storm water into the Sacramento River and Morrison Creek.

113.   The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. See 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

114. CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows into the Morrison Creek and the Sacramento River, all waters of the United States.

115.   CSPA is informed and believes, and thereon alleges, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

116.   Storm water discharges containing pollutants, including but not limited to, O&G, TSS, pH, COD and BOD adversely affect the aquatic environment.

117.   Samples of storm water discharges collected at the Facility contain pollutants including COD, BOD, and TSS in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, and

Benchmarks in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

118.    CSPA is informed and believes, and thereon alleges, that during and/or after every significant rain event  or any other storm water or non-storm water discharge that has occurred at the Facility since May 11, 2018 through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, and the WQS.

### F.  Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements

119.    CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

120.    CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the Storm Water Permit.

121.    CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

122.    CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

123.    CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Section XI of the Storm Water Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

124.   CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

125.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to perform visual observations of storm water during QSEs.

126.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

127.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

128.   CSPA is informed and believes, and thereon alleges, that the Facility should be in the ERA Program, but no ERA Reports were located from publicly available locations.

129.   CSPA is informed and believes, and thereon alleges, that the Facility's ERA Reports from recent reporting years were insufficient, requiring ineffective BMPs and no substantial advanced BMP upgrades resulting in continuing noncompliance with the Storm Water Permit.

130.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility fail to collect sufficient storm water samples during QSEs.

131.   Information available to CSPA also suggests that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

132.   CSPA is informed and believes, and thereon alleges, that Defendant has failed to submit complete Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Discharges of Contaminated Storm Water in Violation of
### the Storm Water Permit's Effluent Limitations and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

133.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

134.   CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

135.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. See Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

136.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

137.   CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

138.   Each day since at least May 11, 2018, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

139.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 11, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

140.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

141.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

142.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

143.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

144.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

145.   CSPA is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1  standards, including but not limited to NELs, has discharged and continues to discharge

2  from the Facility each time storm water discharges from the Facility.

3      146.   The Owners/Operators violate and will continue to violate the Storm

4  Water Permit's Receiving Water Limitations each and every time storm water

5  containing levels of pollutants that adversely impact human health and/or the

6  environment, and that cause or contribute to exceedances of WQS discharges from the

7  Facility.

8      147.   CSPA is informed and believes, and thereon alleges, that the

9  Owners'/Operators' violations of Receiving Water Limitations of the Storm Water

10  Permit and the CWA are ongoing and continuous.

11      148.   Each and every violation of the Storm Water Permits' Receiving Water

12  Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C.

13  § 1311(a).

14      149.   By committing the acts and omissions alleged above, the

15  Owners/Operators are subject to an assessment of civil penalties for each and every

16  violation of the CWA occurring from May 11, 2018 to the present, pursuant to Sections

17  309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

18      150.   An action for injunctive relief under the Clean Water Act is authorized by

19  Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

20  alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens

21  of the State of California, for which harm they have no plain, speedy, or adequate

22  remedy at law.

23      151.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

24  because an actual controversy exists as to the rights and other legal relations of the

25  Parties.

26      152.   WHEREFORE, Plaintiff prays for judgment against Defendant as set

27  forth hereafter.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

**THIRD CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Storm Water Pollutant Prevention Plan in Violation of the**
**Storm Water Permit and the Clean Water Act.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

153.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

154.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

155.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

156.   CSPA is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

157.   The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from May 11, 2018, to the present.

158.   The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

159.   The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

160.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

161.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 11, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

162.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

163.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

164.    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Monitoring and Reporting Plan in Violation of**
**the Storm Water Permit and the Clean Water Act.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

165.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

166.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

167.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

168.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

169.    The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from May 11, 2018, to the present.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

170.   The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

171.   The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

172.   Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

173.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 11, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

174.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

175.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

176.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FIFTH CAUSE OF ACTION**
**Defendant's Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

177.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

178.   Section XVI of the General Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP, within the reporting year, and the date of the Annual Evaluation. General Permit Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and our typically uploaded into the SMARTS portal.

179.   The Permit also requires a permittee whose discharges violate the General Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX.B of the Permit and report to the Regional Board regarding same. See General Permit Section XX.B.

180.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the General Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the Storm Water Permit The Facility Owners/Operators have been in violation of Sections XVI and XX of the Storm Water Permit since at least May 11, 2018.

181.   The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

182.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 11, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

183.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

184.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

185.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   **RELIEF REQUESTED**

186.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.   A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1       c.  A Court order assessing civil monetary penalties for each violation

2  of the CWA occurring on or after November 2, 2015, of $64,618 per day, as permitted

3  by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40

4  C.F.R. § 19.4;

5       d.  A Court order awarding Plaintiff its reasonable costs of suit,

6  including attorney, witness, expert, and consultant fees, as permitted by Section 505(d)

7  of the Clean Water Act, 33 U.S.C. § 1365(d); and

8       e.  Any other relief as this Court may deem appropriate.

9

10

11  Dated: February 20, 2024        Respectfully submitted,

12

13                                          _____

14                                        Anthony M. Barnes

15                                        Jason R. Flanders

16                                        Kenya S. Rothstein

17                                        AQUA TERRA AERIS LAW GROUP
                                      Attorneys for Plaintiff

18                                        CALIFORNIA SPORTFISHING
                                      PROTECTION ALLIANCE

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES